United States District Court
Southern District of Texas
**ENTERED**
February 08, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JARROD NEWSOME, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:20-cv-01481 |
| | § | |
| INTERNATIONAL PAPER | § | |
| COMPANY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me are Defendant International Paper Company's Motion for Summary Judgment (Dkt. 30) and Plaintiff's Motion to Extend Time (Dkt. 36). Having reviewed the briefing, the record, and the applicable law, I recommend that International Paper Company's Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion to Extend Time be **DENIED**.

## BACKGROUND

Plaintiff Jarrod Newsome ("Newsome") worked as a truck driver. On January 24, 2019, Newsome delivered sodium hydrosulfide ("NaHS") to a facility in Orange, Texas owned by Defendant International Paper Company ("IP"). NaHS is a chemical used in the manufacturing of paper. When NaHS is exposed to high heat or reacts with an acid, a toxic gas known as hydrogen sulfide ("$H_2S$") can form.

When Newsome arrived at the front gate of the IP facility on January 24, 2019, an IP employee directed Newsome to the normal unload station, where Newsome had delivered NaHS several times before. After Newsome connected his truck to the unload line, he realized that he could not unload the NaHS at the normal unload station because cold weather had frozen the unload line. The IP employee then directed Newsome to drive his truck to an alternate location at the facility to unload the NaHS. Newsome had never delivered NaHS at this alternate location.

Upon arriving at the alternate location, Newsome realized that the air hose was not long enough to reach from his truck to the IP tank. Newsome and two IP employees conferred on a possible solution. The group developed a plan to connect two air hoses together. One air hose would connect to the truck; the other would connect to the IP tank. The two air hoses would then connect together to allow air to flow directly from the tank to the truck.

As planned, Newsome connected his air hose to the truck. He then "noticed that [the IP] air line wasn't hooked to" his hose yet. Dkt. 30-5 at 11. Newsome testified at his deposition: "I reached down to pick [the lines] up to put them together. I smelt something, and I tried to get everybody's attention, but the next thing I know, I must have passed out because I was – when I came to, two guys was picking me off the ground." *Id.*

Approximately a year after the incident, Newsome filed the instant lawsuit against IP. He asserts causes of action for negligence and gross negligence. Newsome contends that he was exposed to $H_2S$ gas, resulting in "life-threatening injuries, including injuries to his central nervous system, brain, and lungs/respiratory system." Dkt. 1-1 at 5. Although Newsome acknowledges that he cannot pinpoint the precise source of the $H_2S$, he claims he can narrow it down to two possible sources: (1) the IP air hose that he picked up to attach to the air hose connected to his truck; or (2) IP's product hose. Either way, Newsome insists, IP is to blame for his significant injuries. Newsome seeks compensatory and exemplary damages.

IP has moved for summary judgment, advancing two main arguments. First, IP contends that Newsome has failed to provide competent expert testimony to raise a fact issue regarding whether IP's alleged conduct resulted in the release of $H_2S$ gas. Second, IP argues that Newsome has failed to meet his burden to establish general and specific medical causation, i.e., that $H_2S$ at the level he was allegedly exposed is generally capable of causing the injuries of which he complains, and that his exposure to $H_2S$ specifically caused his alleged bodily injuries.

## LEGAL STANDARD

"Summary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019); *see also* FED. R. CIV. P. 56(a). A fact issue is material only "if its resolution could affect the outcome of the action." *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 409 (5th Cir. 2002). "A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989).

In determining whether a fact issue exists, I "must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Com. & Indus. Ins. Co. v. Grinnell Corp.*, 280 F.3d 566, 570 (5th Cir. 2002). And "[i]n determining whether there is a genuine dispute of material fact, [I] must consider all of the evidence in the record, but [I] do not make credibility determinations or weigh the evidence." *Austin v. Will-Burt Co.*, 361 F.3d 862, 866 (5th Cir. 2004). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (quotation omitted).

In short, "[s]ummary judgment should be granted where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *In re Deepwater Horizon*, 48 F.4th 378, 382 (5th Cir. 2022) (quotation omitted).

## ANALYSIS

As noted, Newsome brings causes of action against IP for negligence and gross negligence. Because federal jurisdiction is based on diversity of citizenship, I must apply the substantive law of the forum state—Texas. *See Pham v.*

*TransAmerica Premier Life Ins. Co.*, 20 F.4th 921, 924 (5th Cir. 2021). "To prevail on a common law negligence claim [under Texas law], a plaintiff must be able to prove three elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damage proximately caused by the breach." *Gann v. Anheuser-Busch, Inc.*, 394 S.W.3d 83, 88 (Tex. App.—El Paso 2012, no pet.). IP's Motion for Summary Judgment focuses on the third element—proximate cause.

I will assume, without deciding, that Newsome can establish through expert testimony that IP caused the $H_2S$ release. Even so, Newsome's claims fail because he is unable to meet his burden to establish medical causation. Specifically, Newsome cannot create a genuine dispute as to whether exposure to $H_2S$ caused his injuries "based on a reasonable medical probability and scientifically reliable evidence." *Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir. 1999).

## A.   *HAVNER* APPLIES TO CHEMICAL EXPOSURE CASES SUCH AS THIS

It is well-established that an expert's opinions regarding causation cannot be based on unsupported speculation or subjective belief. *See id.* (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711–12 (Tex. 1997)). "The general rule [in Texas] has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007).

Given this legal framework, it should come as no surprise that Texas law requires a plaintiff in a chemical exposure case to present expert testimony of causation. *See Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case."); *City of Dallas v. Furgason*, No. 05-06-00875, 2007 WL 2703134, at *1 (Tex. App.—Dallas Sept. 18, 2007, no pet.) ("Expert testimony is particularly necessary in chemical-exposure cases, in which medically complex diseases and causal ambiguities compound the need for expert testimony."); *Brookshire Brothers, Inc. v. Smith*, 176 S.W.3d 30,

36 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (requiring expert testimony to prove that prolonged use of cleaning products caused asthmatic condition); *Coastal Tankships, U.S.A., Inc., v. Anderson*, 87 S.W.3d 591, 602–04 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (requiring expert testimony to prove that fumes inhaled by crew member working on employer's ship caused pneumonia).

In *Havner*, the Texas Supreme Court set out the basic requirements for proving that exposure to a chemical substance caused a medical injury. *See Havner*, 953 S.W.2d at 714–20. The plaintiffs in *Havner*, parents of a child born with a birth defect, argued that the mother's use of the prescription drug Benedictin caused the birth defect. *See id.* at 708. The Texas Supreme Court framed the issue as "whether the [plaintiffs'] evidence is scientifically reliable and thus some evidence to support the judgment in their favor." *Id.* at 711. The Texas Supreme Court analyzed the plaintiffs' evidence in terms of general and specific causation. *See id.* at 714. "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." *Id.* The Texas Supreme Court held that the plaintiffs' expert testimony, which relied in part on epidemiological studies, was legally insufficient to establish general causation. In reaching this decision, the high court noted that, in some cases, general causation can be established by controlled scientific experiments that "determine if a substance is capable of causing a particular injury or condition." *Id.* at 715. "In the absence of direct, scientifically reliable proof of causation," the Texas Supreme Court required the proponent of medical causation to demonstrate that exposure to the substance "more likely than not" caused the injury by pointing to at least two epidemiological studies.[1] *Id.*

---

[1] "Epidemiological studies examine existing populations to attempt to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition." *Id.* at 715.

The epidemiological studies relied on by a plaintiff seeking to establish general causation must meet certain fundamental requirements. The Texas Supreme Court has summarized *Havner*'s holding in this area as follows:

> *Havner* holds . . . that when parties attempt to prove general causation using epidemiological evidence, a threshold requirement of reliability is that the evidence demonstrate a statistically significant doubling of the risk. In addition, *Havner* requires that a plaintiff show that he or she is similar to the subjects in the studies and that other plausible causes of the injury or condition that could be negated are excluded with reasonable certainty. *Havner* also requires that even if studies meet the threshold requirements of reliability, sound methodology still necessitates that courts examine the design and execution of epidemiological studies using factors like the Bradford Hill criteria to reveal any biases that might have skewed the results of a study, and to ensure that the standards of reliability are met in at least two properly design studies. Thus, a plaintiff must first pass the primary reliability inquiry by meeting *Havner*'s threshold requirements of general causation. Then, courts must conduct the secondary reliability inquiry that examines the soundness of a study's findings using the totality of the evidence test.

*Merck & Co. v. Garza*, 347 S.W.3d 256, 265–66 (Tex. 2011) (cleaned up).

Federal and state courts have relied on *Havner* in cases exactly like this one involving exposure to toxic chemicals. *See, e.g.*, *Cano v. Everest Mins. Corp.*, 362 F. Supp. 2d 814, 822 (W.D. Tex. 2005) ("*Havner* controls the issue of what evidence is required to establish causation in a toxic tort case."); *Cerny v. Marathon Oil Corp.*, 480 S.W.3d 612, 620 (Tex. App.—San Antonio 2015, pet. denied) ("Plaintiffs seeking relief for injuries of any nature caused by exposure to or migration of a toxic substance must meet the stringent proof requirements imposed by the Texas Supreme Court in *Havner* and its progeny."). Whether epidemiological studies support an expert's opinion on the question of general causation in a chemical exposure case like this is critical to determining the reliability of the expert opinion.

Despite this breadth of case law, Newsome argues that *Havner* does not apply. Instead, Newsome insists that he can defeat summary judgment by offering

his own testimony that he "was exposed to a chemical, inhaled the chemical, and suffered an immediate reaction." Dkt. 37 at 15–16. To support this argument, Newsome relies on an unpublished decision from the Waco Court of Appeals. *See Peterson v. Midstate Env't Servs., L.P.*, No. 10-16-00162-cv, 2019 WL 91587 (Tex. App.—Waco Jan. 2, 2019, pet. denied). In *Peterson*, the plaintiff alleged that a tanker truck hit a bump, causing the chemical the truck was transporting to splash onto the hood of her car. *See id.* at *1. The plaintiff further alleged that "she and her children were immediately overcome by fumes, and they felt a burning sensation on their skin." *Id.* After noting that expert testimony is generally "'necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors,'" the court acknowledged that the Texas Supreme Court had held that "lay testimony alone is sufficient to establish causation 'in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence.'" *Id.* at *4 (quoting *Guevara*, 247 S.W.3d at 665, 668). The court allowed the plaintiff's negligence claim to proceed past summary judgment because it believed "one could reasonably infer, without the aid of expert medical testimony, that the alleged accident caused Peterson and her children to suffer some immediate medical injury." *Peterson*, 2019 WL 91587, at *4. The court specifically noted, however, that expert testimony is required to establish any medical conditions other than the "immediate medical injury" of trouble breathing and a burning sensation because the "remaining medical conditions . . . are not 'such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the [alleged accident].'" *Id.* at *4 n.2 (quoting *Guevara*, 247 S.W.3d at 668).

Newsome argues that because he also suffered an immediate medical event at the time of the alleged exposure to $H_2S$, a lay person could evaluate the situation

and decide that $H_2S$ caused his injuries. I disagree. The *Peterson* plaintiff claimed damages for immediate medical *injuries*. In the present case, Newsome claims "life-threatening injuries" from exposure to $H_2S$, "including injuries to his central nervous system, brain, and lungs/respiratory system." Dkt. 1-1 at 5. Newsome also complained at his deposition that he suffers from physical and mental maladies such as neck pain, back pain, memory loss, anxiety, and depression. This is not a case in which the average juror could conceivably connect the potential long-term effects of $H_2S$ exposure to Newsome's specific alleged injuries, especially given that those alleged injuries are, in Newsome's own words, "life-threatening." *Id. Havner* unquestionably applies.

To survive summary judgment, Newsome must show that $H_2S$ is capable of causing his alleged life-threatening injuries (general causation), and that it did, in fact, cause his injuries (specific causation). *See Havner*, 953 S.W.2d at 714.

## B.   DR. SNYDER'S OPINIONS DO NOT SATISFY *HAVNER*

Newsome's expert witness is Dr. Daniel Snyder ("Dr. Snyder"), an expert of "occupational health and safety management systems, specifically in the analysis, design, development, implementation, and evaluation of [occupational health and safety] competency, professional development, training and education." Dkt. 39-8 at 4. Dr. Snyder blithely asserts that "Mr. Newsom[e]'s symptoms appear consistent with an acute hydrogen sulfide (H2S) exposure greater than 700 [parts per million]." *Id.* at 12.

Simply put, Dr. Snyder's expert report and proffered testimony do not meet *Havner's* medical causation standard. As stated, *Havner* requires a plaintiff's experts to (1) produce evidence relying on at least two epidemiological studies demonstrating "more than a doubling of the risk" due to exposure; (2) show that Newsome "is similar to [the participants] in the studies"; and (3) establish that "other plausible causes of the injur[ies]" have been ruled out "with reasonable certainty." *Havner*, 953 S.W.2d at 718, 720.

Dr. Snyder admits that he did not rely on a single epidemiological study when opining on Newsome's injuries and exposure. *See* Dkt. 30-3 at 13. ("Q. Did you search for any epidemiological studies for your work? A. No."). That question and answer effectively ends this discussion. The lack of epidemiological studies in the summary judgment record means that Newsome has not met his burden of general causation under *Havner*. At oral argument, Newsome's counsel candidly admitted that Dr. Snyder's expert testimony would not pass muster under *Havner*.

Dr. Snyder based his conclusions solely on his review of websites for the Occupational Safety and Health Administration ("OSHA") and the National Institute for Occupational Safety and Health ("NIOSH"). He also looked at a toxicology research database of the Agency for Toxic Substances and Disease Registry ("ATSDR"). Although such background materials, documents, and databases are certainly helpful in many respects, they are wholly insufficient as evidence in this context—and for good reason.

> Regulatory and advisory bodies such as . . . OSHA . . . utilize a "weight of the evidence" method to assess the carcinogenicity of various substances in human beings and suggest or make prophylactic rules governing human exposure. This methodology results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances. The agencies' threshold of proof is reasonably lower than that appropriate in tort law, which traditionally makes more particularized inquiries into cause and effect and requires a plaintiff to prove that it is more likely than not that another individual has caused him or her harm.

*Allen*, 102 F.3d at 198 (cleaned up). The Fifth Circuit has expressly held that OSHA and NIOSH guidelines and ATSDR reports are insufficient to establish causation under *Havner*. *See Johnson v. Arkema, Inc.*, 685 F.3d 452, 464 (5th Cir. 2012) (holding that OSHA and NIOSH guidelines do not satisfy *Havner*); *LeBlanc ex rel. Est. of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 100 (5th Cir. 2010) (holding that ATSDR reports are "simply not scientific evidence; that is, they are merely secondary literature that purports to rely on scientific studies").

In short, Newsome has failed to provide any evidence to raise a fact issue on general causation, as required by *Havner*. "[A] plaintiff must establish general causation before moving to specific causation. Without the predicate proof of general causation, the tort claim fails." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).

## C.   DR. HAIMES'S EXPERT TESTIMONY IS UNTIMELY AND FAILS TO SATISFY *HAVNER*

Recognizing that Dr. Snyder's expert testimony does not meet the *Havner* causation standard, Newsome attempts a Hail Mary play. He has filed a Motion to Extend, seeking permission to designate a new expert, Dr. Stanley Haimes ("Dr. Haimes"), to supplement the summary judgment record. The obvious problem with this tactic is that the first time Newsome sought to designate Dr. Haimes as an expert witness in this case was seven months *after* the expert witness deadline had passed.[2]

Newsome first argues that his Motion to Extend is governed by Federal Rule of Civil Procedure 6, which states: "When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect." FED. R. CIV. P. 6(b)(1)(B). But, as IP points out, the correct standard is found in Rule 16(b)(4) because the expert deadline was set out in the scheduling order. "A schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4). "The good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing an extension." *S&W Enters., L.L.C. v. SouthTrust Bank. of Ala., N.A.*, 315 F.3d 533, 535 (5th Cir. 2003) (quotation omitted). In determining whether there is good cause to grant an extension, I consider "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment;

---

[2] Newsome's deadline, as set forth in the Docket Control Order, for "[i]dentification of [his] experts and production of experts' reports" was December 15, 2022. Dkt. 21 at 1. Newsome filed his Motion to Extend Time on July 15, 2023. *See* Dkt. 36.

(3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Id.* at 536 (cleaned up). "Scheduling orders and their enforcement are regarded as essential in ensuring that cases proceed to trial in a just, efficient, and certain manner." *Hernandez v. Mario's Auto Sales, Inc.*, 617 F. Supp. 2d 488, 493 (S.D. Tex. 2009).

In reply, Newsome tacitly acknowledges his misstep and attempts to apply the Fifth Circuit's Rule 16(b) factors. As to his explanation for waiting until well after the expert deadline to identify Dr. Haimes, Newsome argues that it is reasonable for him to designate Dr. Hames at this late juncture "because he believed, and still believes, that *Havner* does *not*" apply to this case. Dkt. 59 at 7. That explanation completely fails to explain why Newsome did not timely designate Dr. Haimes. The *Havner* causation standard is not some new legal test that blindsided Newsome's counsel. "*Havner* is a foundational part of [Texas] jurisprudence." *Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332, 347 (Tex. 2014). If a party wants to rely on expert testimony, he must timely designate the expert. Even though Newsome does not believe *Havner* applies, he could have easily designated Dr. Haimes by the deadline set forth in the Docket Control Order. Allowing Newsome to designate Dr. Haimes seven months ***after*** the expert deadline passed and a month ***after*** IP filed a motion for summary judgment would make the expert deadline absolutely meaningless. "Mere inadvertence on the part of the movant, even when coupled with the absence of prejudice to the non-movant, is insufficient to establish good cause." *Akpan v. United States*, No. H-16-2981, 2017 WL 6527427, at *2 (S.D. Tex. Dec. 21, 2017).[3]

Turning to the second factor, the importance of Dr. Haimes's testimony, Newsome contends Dr. Haimes's expert opinions, if permitted, satisfy *Havner*'s general and specific causation requirements. Not so. As discussed at length,

---

[3] Even under Rule 6's more lenient standard, "[i]nadvertence or mistake of counsel . . . usually will not constitute excusable neglect." *In re Dahlgren Intern., Inc.*, 147 B.R. 393, 406 (N.D. Tex. 1992).

*Havner* requires, at a minimum: (1) two statistically significant epidemiological studies; (2) that demonstrate "more than a doubling of the risk"; and (3) evidence that the plaintiff is "similar to those in the studies." *Havner*, 953 S.W.2d at 720. Although Dr. Haimes does claim that "exposures to hydrogen sulfide have been associated with long term residual effects," Dkt. 36-2 at 7, he does not consider a single epidemiological study. He relies solely on third-party safety guidelines and an ATSDR report, which are insufficient to satisfy *Havner's* medical causation requirements. *See LeBlanc*, 396 F. App'x at 100. After reading Dr. Haimes's expert report, I am convinced that his opinions are wholly insufficient to establish medical causation under *Havner*.

The third factor, prejudice to IP, weighs in IP's favor. Because Newsome failed to timely designate Dr. Haimes, IP prepared and filed a dispositive motion with no inkling that Dr. Haimes might provide expert testimony about causation. IP has had no opportunity to depose Dr. Haimes to test the opinions identified in his expert report. "[T]he potential prejudice to [IP] if the [expert designation] deadline is extended is quite significant. Discovery has been completed and [IP] has prepared and filed [a] dispositive motion[]. . . . Extending the deadline would require [IP] to incur additional expense and would seriously delay the final resolution of this lawsuit." *Akpan*, 2017 WL 6527427, at *3.

The fourth factor requires me to consider whether a continuance could cure such prejudice. In this case, a continuance would do nothing but result in additional delay and increased expenses for all parties. "Because of a trial court's need to control its docket, a party's violation of the court's scheduling order should not routinely justify a continuance." *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004).

Considering all four factors as a whole, I find that Newsome has not demonstrated good cause for failing to designate experts by the December 15, 2022 deadline. As a result, the Motion to Extend Time should be denied.

## CONCLUSION

For the reasons discussed above, I recommend that IP's Motion for Summary Judgment (Dkt. 30) be **GRANTED**, Plaintiff's Motion to Extend Time (Dkt. 36) be **DENIED**, and this case be **DISMISSED**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 8th day of February 2024.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE